UNITED STATES of America, Plaintiff–Appellant,

v.

Anthony R. WEDDLE, Defendant–Appellee.

UNITED STATES of America, Plaintiff–Appellee,

v.

Anthony R. WEDDLE, Defendant–Appellant.

Nos. 93–5691, 93–5739.

United States Court of Appeals, Fourth Circuit.

Argued April 15, 1994.

Decided July 27, 1994.

As Corrected Aug. 17, 1994.

**ARGUED:** John Alexander Gephart, Asst. U.S. Atty., Baltimore, MD, for appellant. Brian Joseph Murphy, Baltimore, MD, for appellee.

**ON BRIEF:** Lynne A. Battaglia, U.S. Atty., Baltimore, MD, for appellant.

Before MURNAGHAN, Circuit Judge, SPROUSE, Senior Circuit Judge, and RESTANI, Judge, United States Court of International Trade, sitting by designation.

Affirmed in part, reversed in part, and remanded by published opinion. Circuit Judge MURNAGHAN wrote the opinion, in which Senior Circuit Judge SPROUSE joined. Judge RESTANI wrote a separate concurring opinion.

## OPINION

MURNAGHAN, Circuit Judge:

Defendant, Anthony R. Weddle, pled guilty to an assault charge in a Maryland state court. While on probation pending judgment, Weddle again threatened the person assaulted, his wife's lover. Weddle pled guilty in federal court to mailing threatening communications in violation of 18 U.S.C. § 876.

At sentencing, the district court departed downward in two instances from the sentencing guideline range, and refused to depart downward in one instance. The Government has appealed, and the defendant has cross-appealed the district court's application of the sentencing guidelines.

## Facts

On April 7, 1993, the defendant waived indictment and pled guilty in the United States District Court for the District of Maryland to a one-count Information charging him with mailing threatening communications in violation of 18 U.S.C. § 876. The facts supporting the defendant's conviction, as stipulated in the plea agreement, are as follows:

In the Summer of 1992, Anthony R. Weddle of Thurmont, Maryland learned that he was suffering from Hodgkin's disease. To aggravate matters, Mr. Weddle's wife of nine years and the mother of his three children, Aretta J. Weddle, left him on July, 28, 1992, to live with Gary L. Angleberger.

Mr. Weddle first responded to his marital difficulties by personally visiting Mr. Angleberger at his residence in Woodsboro, Maryland to ask for the return of his wife. Recognizing that Mr. Weddle was a five-year veteran officer with the Thurmont Police Department, Mr. Angleberger responded that he did not intend to interfere further with the Weddles' marriage. Despite this representation, Mr. Angleberger continued his affair with Mrs. Weddle.

In early August 1992, Mr. Weddle advised the Maryland State Police and Child Protective Services that Mr. Angleberger had slapped and bruised the arm of his daughter Amber Weddle while she was visiting her mother. Mr. Angleberger explained that the bruise resulted from disciplinary action. A subsequent investigation proved inconclusive; consequently, no charges were filed against Mr. Angleberger.

Shortly thereafter, Mr. Weddle gave his sister-in-law Angela C. Hahn specific written instructions regarding a message she was to convey to Mr. Angleberger:

When you go down there [to see Mr. Angleberger] just remind him that he said it [the affair with Mrs. Weddle] was over and if she [Mrs. Weddle] ever shows up[,] to tell her it is over.

. She is my world and nobody could ever love her more tha[n] I.

That if I ever find out anything is going on [between Mr. Angleberger and Mrs. Weddle], I will hunt him down and eliminate him from the picture[,] then do myself. Remind him of his 3 children. I don't want my children hurt [and] I'm sure he doesn't want his children fatherless. There [are] plenty of other wom[e]n out there for him. He doesn't have to take my only love. I can make her happy once again if he'd keep out of the picture.

Ms. Hahn gave Mr. Weddle's written instructions directly to Mr. Angleberger; however, Mr. Angleberger refused to respond. Accordingly, Mr. Weddle began mailing and delivering threatening communications directly to Mr. Angleberger at his home....

On or about August 31, 1992, Mr. Weddle caused the United States Postal Service to deliver a typed letter bearing his name to Mr. Angleberger at his Woodsboro residence, which provided in pertinent part:

[W]e have a score to settle and it won't just disap[p]ear. For one, you had lied to me by saying this [affair] was over, that you did not want the hass[le]s[.] [W]ell, it's too late for that. You are going to pay for what you did to my daughter. For the pain you have caused her, you are going to get in return.

On the evening of September 11, 1992, Mr. Weddle and his brother-in-law Alan Ellison attempted to run Mr. Angleberger and Mrs. Weddle off the road and, when this failed, chased them back to the home of Mr. Angleberger's parents, where Mr. Weddle attempted to assault Mr. Angleberger with a "slapjack" as he and Mrs. Weddle fled into [the] house. This incident caused Thurmont Police Chief Neil F. Bechtol to demand Mr. Weddle's resignation, which was tendered on September 16, 1992. Mr. Weddle subsequently pled guilty to assault in Maryland District Court on November 19, 1992, and received probation before judgment.

Mr. Angleberger responded to this assault by sending Mr. Weddle a letter by certified mail, return receipt requested, on September 15, 1992, in which he warned Mr. Weddle: "You are not welcome on my premises or anywhere near me. You have threatened my life many times and I will prosecute you if

necessary by the laws of the State of Maryland." Mr. Weddle responded by placing the newspaper heading "Obituaries" directly above Mr. Angleberger's signature on this letter and causing the Postal Service to deliver the letter back to Mr. Angleberger at his Woodsboro residence.

On September 24, 1992, David P. Daggett, Assistant State's Attorney for Frederick County, Maryland, advised Mr. Weddle in writing:

> I AM ... ISSUING TO YOU A NOTICE, ON BEHALF OF ARETTA WEDDLE AND GARY ANG[LE]BERGER, TO HAVE NO FURTHER CONTACT WITH HER OR GARY ANG[LE]BERGER. ANY FURTHER CONTACT INITIATED BY YOU OR AT YOUR REQUEST ON EITHER OF THOSE PARTIES MAY BE GROUNDS FOR FURTHER CRIMINAL CHARGES. YOU ALREADY RECEIVED A NOTICE OF TRESPASS ORDER FROM THEM THAT IS STILL IN EFFECT.

(emphasis in original). Shortly thereafter, Mr. Angleberger's parents began receiving anonymous mailed communications that threatened Mr. Angleberger's well-being because of his affair with Mrs. Weddle.

On November 13, 1992, Special Agent David N. Hedges of the Federal Bureau of Investigation warned Mr. Weddle by telephone that he would be prosecuted under federal law if he continued to send threatening communications through the mail. Mr. Weddle acknowledged that he had mailed threatening communications to the Anglebergers, but advised Special Agent Hedges that he would stop. However, Mr. Weddle subsequently caused Mr. Angleberger's parents to receive a mailed package on or about November 21, 1992 containing three .38 caliber "+P" bullets with Mr. Angleberger's name and address affixed to them. Accordingly, Mr. Weddle was arrested.

The package containing the bullets was postmarked November 20, 1992, the day after the state court placed the defendant on probation before judgment for assaulting Angleberger. In the plea agreement, the Government and the defendant stipulated to applicable sentencing guidelines, arriving at an Offense Level of 13. They agreed as well that "no additional sentencing guideline offense characteristics, adjustments or departures apply to this case."

The Probation Officer, however, recommended a one criminal point enhancement under U.S.S.G. § 4A1.1(c), because the state court sentenced Weddle to probation before judgment on November 19, 1992 for the assault on Angleberger, and two criminal history points under U.S.S.G. § 4A1.1(d) because he mailed the three bullets after he had been placed on probation. The three criminal history points placed the defendant in criminal history category II.

The Probation Officer further suggested that the district court should depart downward based on defendant's diminished capacity under U.S.S.G. § 5K2.13, if it concluded that mailing threatening communications constituted a "non-violent offense."

At defendant's sentencing hearing on July 28, 1993, the district court adopted the Government and defendant's stipulation of the applicable sentencing guideline factors and preliminarily calculated the defendant's offense level at 13. However, contrary to the Probation Officer's finding and over the Government's objection, the district court granted the defendant a downward departure of two criminal history points, and consequently one criminal history category, under U.S.S.G. § 4A1.3. The district court concluded that the sentence, absent a downward departure, would over-represent the defendant's criminal history. It justified its downward departure on the ground that the mailing of the bullets was actually part of a continuous offense of the crime charged, rather than a distinct offense that could be considered under § 4A1.1(d), which penalizes acts conducted while a defendant is under the control of the penal system.

Additionally, the district court departed downward three offense levels under U.S.S.G. § 5K2.13 over the Government's objection, based on a finding that defendant suffered from diminished mental capacity.

The district court rejected an invitation by the defendant to make a further reduction based on his family responsibilities.

By departing downward two criminal history points under U.S.S.G. § 4A1.3 and three offense levels under U.S.S.G. § 5K2.13 beyond the stipulated downward departure of two offense levels under U.S.S.G. § 5K2.10, the district court effectively reduced the defendant's applicable sentencing guideline range from 15 to 21 months (offense level 13, criminal history category II) to 6 to 12 months (offense level 10, criminal history category I), thereby allowing the defendant to qualify for a probationary sentence that included home detention. The district court sentenced the defendant to a three-year term of probation, with additional, special conditions that he serve six months of the sentence in home detention and that he "have no contact of any sort through the mail or otherwise with Gary Angleberger or his parents."

The Government has appealed the downward departures, and the defendant has appealed the district court's decision not to grant a departure based on his family responsibilities.

### Discussion

1. *Downward Departure under U.S.S.G. § 4A1.3:*

■ We review departures from the applicable sentencing guidelines range "under a multi-part test of 'reasonableness'...." *United States v. Hummer*, 916 F.2d 186, 192 (4th Cir.1990), *cert. denied*, 499 U.S. 970, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991) (citations omitted). "Under this test, we first examine *de novo* the specific reasons cited by the district court in support of its sentence ... to ascertain whether those reasons encompass factors 'not adequately taken into consideration by the Sentencing Commission in formulating the guidelines.'" *Id.* (citation omitted). If we find that the district court's identification of such factors was justified, "we apply a clearly erroneous standard and review the factual support in the record for those identified circumstances." *Id.*

U.S.S.G. § 4A1.3 provides for the possibility of downward departure where the district court "concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes."

The Government has contended that the district court erred in making the U.S.S.G. § 4A1.3 reduction to compensate for the additional criminal history points assigned to the defendant by the Probation Officer under U.S.S.G. § 4A1.1, which provides, *inter alia,* for additional criminal history points if the defendant commits any relevant conduct related to the instant offense: "while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release or escape status," *see* U.S.S.G. § 4A1.1(d) and commentary n. 4.

The offense for which the defendant was assigned the additional criminal history points was the mailing of the bullets to the victim's parents. Since the mailing occurred on the day after the defendant was placed on probation by the Maryland state court for assaulting Angleberger, the Government has argued that additional criminal history points were appropriate. We agree.

We have earlier rejected the notion that criminal history points accrued under U.S.S.G. § 4A1.1 may be offset by way of a downward departure under U.S.S.G. § 4A1.3. In *United States v. Summers*, 893 F.2d 63, 68 (4th Cir.1990), we held:

It is apparent from the language of U.S.S.G. § 4A1.1, as well as from the commentary, that the Commission recognized the likelihood that a defendant would incur criminal history points under both subsections [U.S.S.G. § 4A1.1(d) and (e) ], as well as under one or more of subsections (a)-(c). The fact that this occurs does not mean that the defendant's criminal history has been overstated.

"The fact remains," the *Summers* court concluded, "that [the defendant] committed the instant offense while on parole...." *Id.*

In the instant case, the district court attempted to distinguish *Summers* by finding that the defendant's mailed threats and assault constituted "one continuing event." Weddle has urged affirmance, agreeing with the district court that all instances of his

criminal behavior were part of a continuous event and asserting that without the offset, the sentence would be too stiff for the crime.

It cannot be doubted that the instant defendant presents a sympathetic case. The district court clearly found that the behavior exhibited in the events leading up to his conviction was extraordinarily uncharacteristic for him. However, *Summers* controls our decision here. While it is true in a sense that the assault was bound up with the threatening mailings, the fact remains that the defendant was on probation in the state system when he committed the offense of mailing the bullets. It is clear, as the *Summers* Court held, that the Sentencing Guidelines intended to punish more severely offenses committed while "under any criminal justice sentence...." U.S.S.G. § 4A1.1. Although the mailings, charged in federal court, and the assault, charged in state court, were born out of the same circumstances, that fact alone is insufficient to overcome Congress' aim, as interpreted by this Court, to punish more severely those offenses undertaken in the shadow of the criminal justice system.

As to the first issue, therefore, we must reverse.

### 2. *Downward Departure under U.S.S.G. § 5K2.13:*

■ The district court further departed downward three offense levels under U.S.S.G. § 5K2.13 based on a finding that the defendant suffered from diminished capacity. The district court held:

Given the overall picture that I have before me, I conclude without any hesitation from a factual standpoint ... that [defendant suffered from] a major depressive episode.... [O]n that basis and on th[e] finding ... that [defendant's] threatening letters were not violent in and of themselves, and [that] there was no violence other than that which occurred on that one occasion, I am satisfied that departure is appropriate under [U.S.S.G. §] 5K2.13.

On appeal, the Government has advanced two arguments: first, it has asserted that U.S.S.G. § 5K2.13 is not applicable to the defendant's conduct; and, second, in the event we find that U.S.S.G. § 5K2.13 is applicable, that the specific conduct herein considered does not qualify for a reduction in the sentence.

U.S.S.G. § 5K2.13 provides:

If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need to protect the public.

The issue in the instant case, therefore, is whether the defendant's threatening mailings constituted a non-violent offense under the sentencing guidelines. If so, he is eligible, though not assured, of a downward departure.

Unfortunately, U.S.S.G. § 5K2.13 itself nowhere defines what is meant by the phrase "non-violent offense." The lack of definition has sparked a division among the circuits, between those courts who would import from another guideline section the definition of a "crime-of-violence" and one which has held that U.S.S.G. § 5K2.13 stands on its own and requires a case-by-case inquiry. We have not as yet had occasion to consider the question. *See United States v. Butt,* 1994 WL 4671, *5 n. 2, 1994 U.S.App. LEXIS 247, *13 n. 2 (unpublished *per curiam*) (stating awareness of circuit split but not resolving the issue). The district court, following a recent case by the D.C. Circuit adopted the latter approach, while the Government has argued that the proper approach is the one adopted by the other circuits.

Those circuits that have accepted the view of the sentencing guidelines advanced by the Government have imported into U.S.S.G. § 5K2.13 the definition of "crime of violence" contained in a guideline addressed to career offenders. Specifically, U.S.S.G. § 4B1.2(1) states:

The term "crime of violence" means any offense under federal or state law punishable by imprisonment for a term exceeding one year that—(i) has as an element the

use, attempted use or *threatened use of physical force against the person of another.*

(emphasis added). Thus, under U.S.S.G. § 4B1.2.(1) the behavior in which Weddle engaged would constitute, at least for the purposes of U.S.S.G. § 4B1.2.(1), a "crime of violence."[1] The question we must answer is whether a "crime of violence" as defined in U.S.S.G. § 4B1.2.(1) can also be a non-violent offense for the purposes of U.S.S.G. § 5K2.13. If so, then the district court was within its discretion in applying the sentencing guidelines, in finding Weddle eligible for a reduction.

Five circuits have determined that a defendant convicted of a "crime of violence," as defined by U.S.S.G. § 4B1.2.(1), does *not* qualify for a downward departure for diminished mental capacity under U.S.S.G. § 5K2.13, holding in essence that a "crime of violence" cannot also be a non-violent offense. *United States v. Cantu,* 12 F.3d 1506, 1513 (9th Cir.1993); *United States v. Poff,* 926 F.2d 588, 591 (7th Cir.) (*en banc*), *cert. denied,* ── U.S. ──, 112 S.Ct. 96, 116 L.Ed.2d 67 (1991); *United States v. Russell,* 917 F.2d 512, 517 (11th Cir.1990), *cert. denied,* 499 U.S. 953, 111 S.Ct. 1427, 113 L.Ed.2d 479 (1991); *United States v. Rosen,* 896 F.2d 789, 791 (3d Cir.1990); *United States v. Maddalena,* 893 F.2d 815, 819 (6th Cir.1989), *cert. denied,* ── U.S. ──, 112 S.Ct. 233, 116 L.Ed.2d 190 (1991).[2]

By contrast and most recently, the D.C. Circuit has held that an act defined by U.S.S.G. § 4B1.2.(1) as a "crime of violence" can also be a "non-violent offense" for the purposes of U.S.S.G. § 5K2.13. *United States v. Chatman,* 986 F.2d 1446, 1451–52 (D.C.Cir. 1993).

The Seventh Circuit's *Poff* decision and the D.C. Circuit's *Chatman* decision provide the only detailed analyses of the issue presented. Therefore, it is to those cases that we turn for particular guidance.

The district court in *Poff* sentenced defendant, who had incurred numerous convictions for threatening presidents and a prosecutor while suffering from mental illness, to imprisonment for 51 months as a career offender under U.S.S.G. § 4B1.1 and declined to depart downward based on defendant's diminished capacity under U.S.S.G. § 5K2.13 because mailing threatening communications is defined under U.S.S.G. § 4B1.1, as a "crime of violence." 926 F.2d at 590. On appeal, the defendant argued that she was entitled to the diminished capacity departure because she never carried out her threats and, thereby, had committed a "non-violent offense." *Id.* at 591.

In a 6–5 *en banc* decision, the Seventh Circuit upheld the district court's ruling, noting: "We decline to adopt [the defendant's] argument that rests on the premise that the Guidelines define the same act as both a 'crime of violence' and a 'non-violent offense.'" *Id.* The *Poff* court continued:

True, in one case [the Sentencing Commission] used a negative construction—"non-violent"—and in the other case used a prepositional phrase containing the noun "violence" as a modifier rather than using the simpler adjective "violent"—but the root, and meaning, are the same in both cases. (One might ascribe significance to the use of "offense" in § 5K2.13 and "crime" in § 4B1.2, but that would not help [defendant] since "offense" encompasses a broader spectrum of illegality than does "crime.") "[A] rather heavy load rests on him who would give different meanings to the same word or the same phrase when used a plurality of times in the same Act." ... [Defendant] cannot meet that burden by asking us to tease meaning from the Commission's use of a prepositional phrase rather than an adjective. The Guidelines should be read as a whole, § 1B1.(i), and

---

1. Additionally, mailing threatening communications constitutes a "crime of violence," as defined by Congress in 18 U.S.C. § 16.

2. As noted above, this Court has not yet decided the issue presented. One unpublished decision prior to *Butt,* 1994 WL 4671, 1994 U.S.App. LEXIS 247, *United States v. Stutts,* 1992 WL 14594, 1992 U.S.App. LEXIS 1160 (4th Cir. Jan. 30, 1992) (per curiam) (unpublished), cited *Rus-*

*sell,* 917 F.2d 512, and *Maddalena,* 893 F.2d 815, for the proposition that bank robbery is a violent crime for the purposes of U.S.S.G. § 5K2.13. We gave no indication, however, whether we agreed with the importation of the definition contained in U.S.S.G. § 4B1.2.(1) to reach that result. *See id.* 1992 WL 14594, at *2, 1992 U.S. App. LEXIS 247, at *4. On the facts of *Stutts,* no such discussion or holding was necessary.

when the same word appears in different, though related sections, that word likely bears the same meaning in both instances.

*Id.* (citations omitted). The *Poff* court then noted its view that the defendant's argument presented a contradiction:

[Defendant's] reading supposes that in § 4B1.2 the Commission concluded that she required *additional* incarceration because of her criminal history (making threats) and in § 5K2.13 that she warranted *less* incarceration because of the same history (*merely* making threats). We cannot credit a reading that produces such an illogical and inconsistent interpretation of the Guidelines.

*Id.* at 592.

The *Poff* majority faced a spirited dissent written by Judge Easterbrook, and joined by four of his colleagues. The dissent acknowledged that "[a]lthough a textual argument support[ed] [the majority's conclusion], we should not attribute this heartlessness to the Sentencing Commission unless we must—and we needn't." *Id.* at 593 (Easterbrook, J. dissenting).

In presenting its argument, the dissent first noted that the Commission selected different formulations of the word "violence" in the two sentencing guidelines. "Although [the Commission] laid out a detailed meaning for 'crime of violence' in § 4B1.2, it did not provide so much as a cross-reference in § 5K2.13, a curious omission if the Commission meant to link these phrases so tightly that they are mutually exclusive." *Id.* at 594 (Easterbrook, J. dissenting). The lack of reference struck the dissent as particularly odd in the context of the Guidelines, since they were written as a unit "and with greater than customary attention to the relation among sections." *Id.* (citation omitted) (Easterbrook, J. dissenting).

Judge Easterbrook then confronted the majority's conclusion that the defendant's construction of the sentencing guidelines created a contradiction:

"Crime of violence" and "non-violent offense" have a root word in common but readily may take meanings other than opposites. As the Commission was at pains to establish in § 4B1.2, whether a crime is one "of violence" depends on its elements and not on the defendant's conduct, so that an unrealized prospect of violence makes the crime one of violence. This is an abnormal sense, a term of art. It took detailed definition to make it so. Then comes § 5K2.13, in which "non-violent offense" appears without elaboration or cross-reference. Best to read these words in their ordinary sense rather than as tied to the term of art in § 4B1.2. A "non-violent offense" in ordinary legal (and lay) understanding is one in which mayhem did not occur. The prospect of violence (the "heartland of the offense," in the guidelines' argot) sets the presumptive range; when things turn out better than they might, departure is permissible.

*Id.* (citation omitted) (Easterbrook, J. dissenting). As Judge Easterbrook pointed out, his interpretation was consistent with the purpose of U.S.S.G. § 5K2.13, which grants a degree of lenity to those less able to control their actions, when those actions are, in fact, not dangerous. "A hefty sentence may be appropriate simply because it incapacitates and so reduces the likelihood of further offenses. When the disturbed person's conduct is non-violent, however, incapacitation is less important." *Id.* at 595 (Easterbrook, J. dissenting).

The D.C. Circuit relied extensively on Judge Easterbrook's thoughtful dissent in rendering its decision in *United States v. Chatman,* 986 F.2d 1446 (D.C.Cir.1993), a bank robbery case. Although it followed the *Poff* dissent, the D.C. Circuit also underscored the policy considerations that suggested the two terms are meant to be distinct. The court noted that under U.S.S.G. § 4B1.2, the definition of "crime of violence" extends beyond crimes of actual violence, but also to "many crimes that have 'unrealized violence' as well." *Id.* at 1451 (citation omitted). Such a construction seems sensible when it is realized that "section 4B1.2 can be read as depriving career offenders of the benefits of the doubt, and assuming the worst." *Id.* The section therefore treats some non-violent crimes as violent.

The rationale for U.S.S.G. § 5K2.13 is different. "In contrast to the purposes of section 4B1.2, the point of section 5K2.13 is to treat with lenity those individuals whose 'reduced mental capacity' contributed to commission of a crime." *Id.* at 1452.

> Considered in this context, the term "nonviolent offense" in section 5K2.13 refers to those offenses that, in the act, reveal that a defendant is not dangerous, and therefore need not be incapacitated for the period of time the Guidelines would otherwise recommend.

*Id.* (citation omitted). Finally, the D.C. Circuit noted that a determination of danger posed by a defendant is best reached through a fact-specific investigation. *Id.*

Although the D.C. Circuit is in the minority in its interpretation of U.S.S.G. § 5K2.13, we believe that it and the *Poff* dissent have the better argument. U.S.S.G. § 5K2.13 is intended to create lenity for those who cannot control their actions but are not actually dangerous; U.S.S.G. § 4B1.2 is intended to treat harshly the career criminal, whether or not their actual crime is in fact violent.[3] Moreover, the choice of different phrasing, the absence of a cross-reference, and the careful definitions attached to one section but not the other, all suggest that the Sentencing Commission did not intend to import its definition from one section into another. Consequently, we conclude that the district court was correct in finding that Weddle was eligible for a reduction under U.S.S.G. § 5K2.13.

■ The question still remains, however, whether a reduction should have been granted; whether, in other words, the offense committed by Weddle, was non-violent.[4] The district court found:

> I conclude without any hesitation from a factual standpoint ... that [defendant suffered from] a major depressive episode. This was an episode that occurred in the context of the significantly reduced mental capacity, and on that basis and on th[e] finding ... that [defendant's] threatening letters were not violent in and of themselves, and [that] there was no violence other than that which occurred on that one occasion, I am satisfied that departure is appropriate. ...

The Government has asserted that the threat made by Weddle was violent, because he continued to threaten Angleberger even after he was charged for assault in state court, fired from his job, and warned by the authorities to cease his threatening behavior. Moreover, the threat took the form not of a written communication but of bullets sent through the mail and inscribed with Angleberger's name.

Applying a clearly erroneous standard to the district court's factual findings, we find that the district court committed no error in finding that Weddle's behavior was non-violent.[5] It is clear from the record that the district court found that the behavior was non-violent, attributable to the depressive episode, and highly unlikely to be repeated.

### 3. *Refusal of Downward Departure Under U.S.S.G. § 5H1.6:*

■ The defendant has asserted in his cross-appeal that the district court failed to recognize its power to depart downward on the basis of his family responsibilities under U.S.S.G. § 5H1.6 of the sentencing guidelines. He has cited a number of cases to the effect that such a departure is permitted in extraordinary circumstances.

At the outset, however, we note that we have construed 18 U.S.C. § 3742(a), govern-

---

3. We note that the title used by the Commission in labeling U.S.S.G. § 4B1.2 is "Definitions of Terms *Used in Section 4B1.1.*" (emphasis added). The explicit application of the Guideline lends support to Judge Easterbrook's observation that the terms therein included are terms of art, directed to career offenders.

4. We note that the Government has not challenged the district court's finding that Weddle

suffered from a depressive episode, such that he had diminished capacity, another requirement under the guideline.

5. The district court relied, *inter alia*, on Weddle's "excellent record as a law enforcement officer," and the many letters demonstrating his "exemplary" character.

ing a defendant's right to appeal a sentence, to hold that "[w]hen [a] district court recognizes its discretion to depart downward [under the guidelines], its decision to decline to do so is not reviewable by this [C]ourt." *United States v. Graham,* 946 F.2d 19, 22 (4th Cir.1991) (citing *United States v. Bayerle,* 898 F.2d 28, 31 (4th Cir.), *cert. denied,* 498 U.S. 819, 111 S.Ct. 65, 112 L.Ed.2d 39 (1990)).

Here, the district court recognized its discretion to depart downward, but concluded that precedent established by this court does not allow the consideration of a defendant's status as a single, custodial parent to create an extraordinary circumstance justifying downward departure. In *United States v. Brand,* 907 F.2d 31, 33 (4th Cir.), `cert. denied,* 498 U.S. 1014, 111 S.Ct. 585, 112 L.Ed.2d 590 (1990), we held:

> A sole, custodial parent is not a rarity in today's society, and imprisoning such a parent will by definition separate the parent from the children. It is apparent that in many cases the other parent may be unable or unwilling to care for the children, and that the children will have to live with relatives, friends, or even in foster homes. . . . [Defendant's] situation, though unfortunate, is simply not out of the ordinary.

*See also United States v. Bell,* 974 F.2d 537, 538–39 (4th Cir.1992) (citing *Brand* with approval), *cert. denied,* 498 U.S. 1014, 111 S.Ct. 585, 112 L.Ed.2d 590 (1990).

At sentencing, Weddle's counsel and the Government addressed whether specific family responsibilities warranted a downward departure. The district court responded:

> Well I have already been told rather directly by the Fourth Circuit [that] there

are some things that I cannot do. You are familiar with the [*Bell* ] case for instance[,] which was a family kind of a situation such as you speak of. The Court told me that I could not depart on that basis.

It is clear that the district court considered the defendant's situation to be similar to that of the defendant in *Bell,* and therefore refused to depart downward. We find no error in the district court's application of U.S.S.G. § 5H1.6.

### *Conclusion*

Accordingly, the district court opinion is affirmed in all respects, with the exception of its downward departure under U.S.S.G. § 4A1.3. On that point, we remand to the district court for resentencing consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

RESTANI, Judge, concurring:

I agree with the majority that this court's opinion in *United States v. Summers,* 893 F.2d 63 (4th Cir.1990), is dispositive of whether the application of U.S.S.G. § 4A1.1 can lead to an overrepresentation of a defendant's criminal history. I would like to emphasize, however, that *Summers,* like the case before us, concerned an issue of double-counting arising from the application of multiple subsections of U.S.S.G. § 4A1.1.

Weddle was assessed one criminal history point for the state court's imposition of a sentence of probation, which constitutes a prior criminal sentence other than a sentence of imprisonment of at least sixty days under U.S.S.G. § 4A1.1(c).* Weddle was assessed two additional criminal history points under U.S.S.G. § 4A1.1(d) for having committed the instant offense while under the prior sentence of probation. *Summers* does not allow us to consider the application of these two subsections in tandem to be double-counting.

---

* Section 4A1.1(a) mandates three criminal history points for a sentence of imprisonment exceeding one year and one month, while § 4A1.1(b) directs the assessment of two points for a sentence of imprisonment of at least sixty days not count-

ed in (a). U.S.S.G. § 4A1.1(a), (b) (1991). Section 4A1.1(c) requires a sentencing judge to add one point for each prior sentence not counted in (a) or (b). *Id.* § 4A1.1(c).

893 F.2d at 68. Therefore, I agree that the district court's downward departure under U.S.S.G. § 4A1.3 should be reversed.

Furthermore, I agree with the majority's adherence to the D.C. Circuit decision in *United States v. Chatman,* 986 F.2d 1446 (D.C.Cir.1993). Whether this offense is violent or non-violent is a difficult question, however. Weddle's threat was communicated through the mails rather than in the presence of the victim, lessening the immediacy of the threatened harm. Given the surrounding factual circumstances, I agree with the majority's conclusion that the district court's characterization of the offense as non-violent is not clearly erroneous.