UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellant,*

v.                                          No. 03-4902

KENNETH ROBERT SPRING,
        *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of North Carolina, at Asheville.
Graham C. Mullen, Chief District Judge.
(CR-00-88-MU; CR-02-56-MU)

Argued: June 4, 2004

Decided: September 7, 2004

Before GREGORY and DUNCAN, Circuit Judges, and
Robert R. BEEZER, Senior Circuit Judge of the
United States Court of Appeals for the Ninth Circuit,
sitting by designation.

Affirmed in part, reversed in part, and remanded with instructions by
unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Thomas Richard Ascik, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North
Carolina, for Appellant. Richard Deke Falls, BARNETT & FALLS,
Charlotte, North Carolina, for Appellee. **ON BRIEF:** Robert J. Con-

rad, Jr., United States Attorney, Asheville, North Carolina, for Appellant.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

The United States (the "Government") appeals from the district court's order granting a downward departure from the federal Sentencing Guidelines in favor of the defendant, Kenneth Robert Spring. A jury convicted Spring on multiple counts of mailing threatening communications and threatening to use a weapon of mass destruction in violation of 18 U.S.C. §§ 876 and 2332a. Although the Guidelines produced a sentencing range of 360 months to life imprisonment, the district court concluded that the circumstances of Spring's case fell outside the "heartland" of the Sentencing Guidelines, and sentenced Spring to a term of 78 months' imprisonment. We conclude that the district court erred in granting a departure with respect to all but one of the factors it identified. Accordingly, we reverse the district court's downward departure and remand for resentencing in accordance with this opinion.

I.

A.  *Prior Violent Crime Felony Convictions*

On November 7, 1997, Spring pled guilty to a single count of "mailing threatening communications" in violation of 18 U.S.C. § 876.[1]

---

[1]In pertinent part, 18 U.S.C. § 876 provides that whoever mails

any communication . . . addressed to any other person and containing any threat . . . to injure the person of the addressee or of

The conviction resulted from a May 1996 letter that Spring mailed to the Sheriff's office in Jackson County, North Carolina, in which he threatened to murder various deputy sheriffs. Spring was sentenced to a term of ten months' imprisonment and three years' supervised release. Spring completed his sentence and was released on September 3, 1999. However, he was arrested only a month later, after probation officer Jeffrey Naber found him in possession of various weapons, in violation of his supervised release. On February 14, 1999, United States District Judge Lacy Thornburg revoked Spring's supervised release and sentenced him to a term of nine months' imprisonment.

On May 22, 2000, prison officials in Butner, North Carolina intercepted an outgoing letter from Spring addressed to Jeffrey Naber. The letter contained threats to murder various individuals, including Naber, Judge Thornburg, and their respective families. On July 11, 2000, one day before the completion of his sentence on the supervised release violation, Spring was charged in a criminal complaint, arrested, and continued in federal custody pending an indictment on charges arising out of this letter. On September 19, 2000, Spring was indicted on three violations of 18 U.S.C. § 115, which prohibits threats made with the intent to interfere with or retaliate against a federal official.[2] Spring pleaded not guilty to these charges, but a jury convicted him on all three counts on January 26, 2001. Spring was sentenced to a term of 78 months' imprisonment.

---

another, shall be fined under this title or imprisoned not more than five years, or both. If such a communication is addressed to a United States judge, Federal law enforcement officer, or an official who is covered by section 1114, the individual shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 876(c).

[2]Title 18 U.S.C. § 115 prohibits threats to assault a federal official or the official's immediate family "with intent to impede, intimidate, or interfere with such official . . . while engaged in the performance of official duties, or with intent to retaliate against such official . . . on account of the performance of official duties." 18 U.S.C. § 115(a)(1)(B).

B. *The Instant Offenses*

While Spring was incarcerated and awaiting trial on the September 2000 indictment, he mailed several more letters threatening to murder Jeffrey Naber and Judge Thornburg. One such letter was received in the chambers of Judge Thornburg on August 14, 2000. A letter containing similar threats was received in the Asheville, North Carolina probation office on September 9, 2000, and again on November 11, 2000. On December 5, 2000, a federal grand jury indicted Spring on charges related to these three letters. A superseding indictment, however, was issued on April 2, 2001, to include charges related to a fourth threatening letter Spring mailed to the probation office on February 5, 2001. The April 2001 indictment included a total of twenty-six counts, including thirteen counts of mailing threatening communications in violation of 18 U.S.C. § 876, and thirteen counts of making threats in retaliation against federal officials in violation of 18 U.S.C. § 115.

In May of 2002, before Spring could be tried on the April 2001 indictment, he mailed two more letters to Judge Thornburg at the judge's chambers in Asheville, North Carolina. Each letter contained a death threat, as well as a white powdery substance, which the letter claimed was anthrax.[3] On June 7, 2002, a federal grand jury returned an eight-count indictment against Spring on charges arising out of these letters. The indictment charged Spring with four counts of threatening to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a. Two of these counts charged Spring with making threats against Judge Thornburg, while the other two charged him with making threats against the federal courthouse in Asheville. Of the four remaining counts, two charged Spring with violating the threatening communications statute, 18 U.S.C. § 876, while the other two counts charged him with violating the retaliation statute, 18 U.S.C. § 115.

The June 2002 indictment was joined with the April 2001 indictment for a two-day trial beginning on September 10, 2002. The jury convicted Spring on the two counts of threatening to use a weapon of

---

[3]The North Carolina State Bureau of Investigation later determined that the substance found in the letter was acetaminophen.

mass destruction against the federal courthouse, as well as the fifteen counts of mailing threatening communications. Spring was acquitted of all fifteen of the retaliation counts, and the Government voluntarily dismissed the counts for threatening to use a weapon of mass destruction against Judge Thornburg.

C. *Sentencing*

The computation of Spring's sentence was not controlled by the applicable guideline for threatening communications, U.S.S.G. § 2A6.1, or the guideline for threatening the use of a weapon of mass destruction, U.S.S.G. § 2M6.l. Rather, the controlling factor in Spring's sentence was the district court's conclusion that he was a "career offender" under U.S.S.G. § 4B1.1. In pertinent part, § 4B1.1 provides that:

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a) (2002). Because threatening a violent crime is itself a violent crime under the career offender guideline,[4] the presentence investigation report classified Spring as a career offender on account of his two prior violent crime convictions. The present case constituted the necessary third conviction. As a career offender under § 4B1.1, the presentence report assigned Spring a total offense level of 37, and a Criminal History Category of VI, which resulted in a sentencing range of 360 months to life imprisonment.

---

[4]Guideline § 4B1.2 provides that "[t]he term 'crime of violence' means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that . . . has as an element the use, attempted use, *or threatened use* of physical force against the person of another." U.S.S.G. § 4B1.2(a)(1) (2002) (emphasis added).

Spring subsequently requested a downward departure on the grounds that: (1) he committed the offenses while suffering from a diminished capacity; (2) his criminal history had been overstated; (3) the seriousness of his offense level had been overstated; (4) he had an extraordinary motive for committing the offenses; (5) he was unusually susceptible to prison abuse; and (6) the combination of all five factors was an independent basis for a downward departure. The district court addressed the six bases for Spring's departure motion and accepted each one. In fixing the extent of the departure, the court reduced Spring's total offense level from 37 to 26, and adjusted his Criminal History Category from VI to III. This produced a Guidelines range of 78 to 97 months' imprisonment. After hearing argument on this range, the court imposed a sentence of 78 months' imprisonment.

## II.

The fact that Congress has altered the traditional standard for reviewing departure decisions is significant in this case. We continue to review findings of fact for clear error and the magnitude of a sentencing departure for abuse of discretion. 18 U.S.C. § 3742(e). However, Congress amended 18 U.S.C. § 3742(e) by enacting the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, Pub. L. No. 108-21, 117 Stat. 650, which requires that we review de novo whether a sentencing departure was based on a factor that does not advance the objectives of sentencing or is not justified by the facts of the case. *United States v. May*, 359 F.3d 683, 687-88 (4th Cir. 2004) (stating that "when determining whether the sentence departs from the applicable guideline range based on a factor that—is not justified by the facts of the case; 'the court of appeals shall review de novo the district court's application of the guidelines to the facts.'") (quoting 18 U.S.C. § 3742(e)). As a result, certain departure decisions that were once entrusted to the sound discretion of trial judges are no longer accorded deference.

## III.

We observed in *United States v. Rybicki*, 96 F.3d 754 (4th Cir. 1996), that:

Under the Sentencing Guidelines, a district court must ordinarily impose sentences within the range specified by the

applicable guideline. Each guideline attempts to anticipate a broad range of typical cases — a "heartland" — that is representative of the circumstances and consequences of ordinary crimes of the type to which the guideline applies. *Koon [v. United States*, 518 U.S. 81, 92 (1996)]. Only if the district court determines that the circumstances and consequences of a case are "atypical" or "unusual" and, therefore, that the case does not fall within the guideline's heartland may it exercise discretion to depart from the specified sentencing range. To determine whether a circumstance is "atypical" or "unusual," and, therefore, capable of taking a case out of the applicable guideline's heartland, district courts should consider not only the Guidelines themselves, but also the Sentencing Commission's policy statements and official commentary.

*Id.* at 757 (citations omitted). *Rybicki* prescribed the following analysis for district courts when considering a sentencing departure:

1.   The district court must first determine the circumstances and consequences of the offense of conviction. . . .

2.   The district court must then decide whether any of the circumstances or consequences of conviction appear "atypical," such that they potentially take the case out of the applicable guideline's heartland. . . .

3.   Having identified factors that may potentially remove a case from the applicable guideline's heartland, the district court must identify each according to the Guidelines' classification as a "forbidden," "encouraged," "discouraged," or "unmentioned" basis for departure. . . . A factor classified as "forbidden," *see, e.g.*, U.S.S.G. § 5H1.10 (race, sex, national origin, creed, religion, socio-economic status) . . . can never provide a basis for departure and its consideration ends at this step.

4.   "Encouraged" factors, *see, e.g.*, U.S.S.G. § 5K2.10 (victim provocation as a downward departure factor) . . . are usually appropriate bases for departure. But such factors

may not be relied upon if already adequately taken into account by the applicable guideline . . . . Conversely, "discouraged" factors, *see, e.g.*, U.S.S.G. § 5H1.6 (family ties and responsibilities) . . . are "not ordinarily relevant," but may be relied upon as bases for departure "in exceptional cases," e.g., where "the factor is present to an exceptional degree or in some other way that makes the case different from the ordinary case where the factor is present." . . . Finally, although the Sentencing Commission expects departures based on "unmentioned" factors to be "highly infrequent," such factors may justify a departure where the "structure and theory of both relevant individual guidelines and the Guidelines as a whole" indicate that they take a case out of the applicable guideline's heartland.

5.   As the last step, the district court must consider whether circumstances and consequences appropriately classified and considered take the case out of the applicable guideline's heartland and whether a departure from the guideline's specified sentencing range is therefore warranted.

*Id.* at 757-58 (citations omitted).

A.   *Diminished Capacity*

The district court departed from the Guidelines on the grounds that Spring committed the offenses while suffering from a diminished mental capacity. Specifically, the court explained that

based on all of the information and evidence, the defendant has [*sic*] significantly reduced ability to exercise the power of reason or control over wrongful behavior. The Court further states that no normal person would do what he did for the reasons that he did. The Court finds that 5K2.13 is encouraged, but is not taken into account in the applicable guideline. There was no serious threat of violence—the defendant was not capable of carrying out any of these things. The Court determines that the defendant is completely irrational and the Court finds that that irrationality

> explains and contributed to, and in fact, was the basis for his behavior in this case.

J.A. at 566. The Sentencing Guidelines define "significantly reduced mental capacity" as the inability to "understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason" or the inability to "control behavior that the defendant knows is wrongful." U.S.S.G. § 5K2.13, cmt. n.1. (2002).

In light of the facts of this case, however, the finding that Spring was unable to exercise the power of reason or control over his wrongful behavior is questionable. On August 15, 2001, Magistrate Judge Horn ordered that the Federal Bureau of Prisons perform a psychiatric evaluation of Spring. The Federal Medical Center of the Prison Bureau thereafter concluded that "[a]t the time of the alleged offenses, Spring was able to understand the nature, quality, and wrongfulness of his actions, and had the capacity to conform his conduct to the requirements of the law." J.A. at 670. This conclusion was followed by an eighteen-page forensic evaluation report explaining its underlying basis. The district court identified no facts to suggest that the conclusion reached in this report was wrong. Nor did the court identify any facts to support the finding that Spring's "irrationality" rendered him incapable of controlling his wrongful conduct.

Moreover, a sentencing court may not depart on the basis of a factor that has "already been adequately taken into account by the applicable guideline." *Rybicki*, 96 F.3d at 758. The Guidelines state that "a court may not depart from the applicable guideline range if . . . the defendant's criminal history indicates a need to incarcerate the defendant to protect the public." U.S.S.G. § 5K2.13 (2002). The district court failed to address this requirement in its statement justifying the departure under § 5K2.13. The court, however, specifically upheld the application of the "career offender" enhancement under § 4B1.1 to Spring. The application of § 4B1.1 placed Spring in Criminal History Category VI, the highest possible category under the Guidelines. The court's finding that Spring was properly classified as a career criminal as a result of his third violent felony conviction would foreclose any argument that it was unnecessary to incarcerate Spring in order to protect the public. Spring's persistent and violent behavior precluded any possibility of a downward departure under § 5K2.13.

## B.  *Overstated Criminal History*

The district court concluded that Spring's Criminal History Category of VI overstated the seriousness of his criminal record and therefore granted a downward departure. Departures on the basis of "overstated criminal history" fall within the category of "encouraged" factors because the Sentencing Commission has acknowledged that "[t]here may be cases where . . . a defendant's criminal history category significantly over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." U.S.S.G. § 4A1.3 (2002). The district court concluded that a downward departure was warranted on the basis of this factor because Spring "never sold drugs" or "committed an actual act of violence."[5] J.A. at 565. This observation, however, was not sufficient to remove Spring's case from the heartland of the Guidelines. First, no departure may issue if it is "inconsistent with the structure and theory of the relevant guidelines." *Rybicki*, 96 F.3d at 759. The district court's departure on the grounds that Spring never sold drugs or committed an "actual" act of violence is at odds with the structure and theory of the career offender guideline, because nothing in § 4B1.1 suggests that the career offender enhancement is limited to drug traffickers or physically violent offenders. Indeed, § 4B1.2 specifically includes the "threatened use" of physical force in defining the term "crime of violence."

Second, § 4A1.3 provides that a departure for overstated criminal history is warranted only if the defendant's criminal history category "does not adequately reflect the seriousness of the defendant's criminal history or likelihood of recidivism." U.S.S.G. § 4A1.3 cmt. background (2002). Over a period of five years, Spring engaged in a relentless campaign to threaten federal officials in North Carolina. Spring was undeterred by mounting convictions and, indeed, committed these crimes while he was in the custody of the Federal Bureau of Prisons. This behavior, as the district court recognized, resulted in his classification as a career offender under § 4B1.1. The district court effectively nullified the career offender enhancement by awarding a

---

[5]Presumably, in observing that Spring had never committed an "actual" act of violence, the district court was noting that Spring had never committed a *physically* violent offense.

downward departure on the grounds that the seriousness of Spring's criminal history was overstated. In *United States v. Weddle*, 30 F.3d 532, 536 (4th Cir. 1994), however, we disapproved of "the notion that criminal history points accrued under [Chapter Four of the Sentencing Guidelines] may be offset by way of a downward departure under U.S.S.G. § 4A1.3." Specifically, *Weddle* observed that:

> It is apparent from the language of U.S.S.G. § 4A1.1, as well as from the commentary, that the Commission recognized the likelihood that a defendant would incur criminal history points . . . under one or more of subsections (a)-(c). The fact that this occurs does not mean that the defendant's criminal history has been overstated.

*Id.* at 536. On these facts, no departure was justified on the grounds that Spring's criminal history was overstated.

### C.   *Overstated Seriousness of the Offenses*

The district court granted Spring's departure motion on the grounds that the Guidelines range overstated the seriousness of his offenses. The Guidelines do not mention this factor as a permissible justification for a departure, and thus it falls within the disfavored category of "unmentioned" factors. *Rybicki*, 96 F.3d at 758. Valid departures on the grounds of unmentioned factors are "highly infrequent." *Koon*, 518 U.S. at 96 (internal quotation omitted). The district court was not justified in departing downward on this basis. A jury convicted Spring on two counts of threatening to use a weapon of mass destruction in violation of 18 U.S.C. § 2332a, and on 15 counts of mailing threatening communications in violation of 18 U.S.C. § 876. Spring's multiple convictions of offenses that constitute "crime[s] of violence" under § 4B1.2, in our view, fairly indicate that the seriousness of the offenses was not overstated.

### D.   *Extraordinary Motive for the Offenses*

The district court found that Spring mailed the threatening letters in this case with the intent of getting caught and thereby obtaining a lengthy prison sentence. The court therefore concluded that Spring

possessed an "extraordinary" motive for committing the offenses in question and, as a result, departed from the Guidelines:

> The Court finds that the defendant's motive for initiating this mail campaign was, at that time, to stay in prison. Yet the defendant is not some institutionalized "old con" but a virtually delusional failed human being driven to despair by grossly unreasonable supervised release supervision.

J.A. at 566. The court obviously credited Spring's allegations that probation officer Jeff Naber made life for him outside of prison virtually unbearable. Spring testified at his sentencing hearing that while he was on supervised release, Naber deliberately caused Spring to lose his job and repeatedly harassed him to find a suitable residence despite his poverty. As a result, Spring testified that he lacked an effective support system outside of prison, and that he sought to obtain a lengthy sentence, believing that this would qualify him to receive certain resources that would help him "get back on [his] feet." J.A. at 381-82. Thus, the district court concluded that Spring committed his crimes in direct response to the probation officer's "grossly unreasonable" supervision, and held that this factor was sufficient to remove the case from the heartland of the Sentencing Guidelines.

Although the significance of an "extraordinary motive" as a basis for a downward departure is unclear, we interpret the district court's findings with respect to this factor as reflecting a conclusion that Spring committed the offenses in question while under duress. Although the district court may have characterized this departure factor as based on the "extraordinary motive" for the offenses, the only motive the court identified was the "despair" Spring felt as a result of the probation officer's unreasonable conduct. J.A. at 566. The facts of this case, however, do not satisfy the guideline dealing with departures for offenses committed under coercion or duress. In particular, the Sentencing Guidelines state that:

> If the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense, the court may decrease the sentence below the applicable guideline range. . . . Ordinarily coercion will be sufficiently serious to warrant depar-

ture only when it involves a threat of physical injury, substantial damage to property or similar injury resulting from the unlawful action of a third party or from a natural emergency. The Commission considered the relevance of economic hardship and determined that personal financial difficulties and economic pressures upon a trade or business do not warrant a decrease in sentence.

U.S.S.G. § 5K2.12 (2002). On this basis, we have observed that crimes committed under duress caused by personal financial difficulties or economic hardship do not, under any circumstance, warrant a departure from the guidelines. *See, e.g.*, *United States v. Barber*, 119 F.3d 276, 280 (4th Cir. 1997). Whatever despair Spring experienced as a result of Naber's behavior or his own straightened financial circumstances, no departure was permissible on the basis of an extraordinary motive for the offenses.

E.  *Extreme Vulnerability to Prison Abuse*

The district court departed from the Guidelines on the basis that Spring would be extremely susceptible to abuse in prison. The court observed that "the defendant is 5'6" tall, weighs about 90 pounds and looks much younger than his years." J.A. at 565. The court concluded that a departure was warranted based on these observations in addition to its finding that Spring had been the victim of two prior assaults in prison. *Id.* The Guidelines state that "[p]hysical condition or appearance, including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.4 (2002). Obviously, the Guidelines do not prohibit the consideration of a defendant's physical characteristics as a basis for departure in every circumstance. *See Koon*, 518 U.S. at 106-07 (rejecting argument that susceptibility to prison abuse is an impermissible departure factor under all circumstances); *see also Debeir*, 186 F.3d at 568 (stating that extreme vulnerability to prison abuse is a "permissible, though not encouraged, basis for departure."). A sentencing court may not depart on the basis of a discouraged factor unless "the factor is present to an exceptional degree or in some way makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96. The circumstances of this case are similar to *United States v. Lara*, 905 F.2d 599 (2d Cir. 1990), in

which prison authorities were forced to take extreme measures to protect an inmate whose "immature appearance, sexual orientation and fragility" made him particularly vulnerable to abuse. *Id.* at 603. Accordingly, we hold that the district court properly departed from the Guidelines on the basis of Spring's extreme vulnerability to prison abuse, a fact underscored by his victimization in prison on two separate occasions.[6] J.A. at 565.

## IV.

With the exception of Spring's extreme vulnerability to prison abuse, the district court identified no basis justifying a departure from the Sentencing Guidelines in this case. Therefore, the court's downward departure is affirmed only with respect to this one factor. We remand the case so that the district court may properly adjust the magnitude of its sentencing departure in accordance with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND*
*REMANDED WITH INSTRUCTIONS*

---

[6]Because we affirm only one of the district court's six departure factors, we must necessarily reject Spring's argument that the combination of all five factors was an independent basis for a downward departure.