**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

No. 95-5242

ANDREW SCOTT MORIN, a/k/a Scott
Morris,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellant,</u>

v.

No. 95-5300

ANDREW SCOTT MORIN, a/k/a Scott
Morris,
<u>Defendant-Appellee.</u>

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-94-375-A)

Argued: January 29, 1996

Decided: April 5, 1996

Before WILKINSON, Chief Judge, HAMILTON, Circuit Judge,
and BLAKE, United States District Judge for the District of
Maryland, sitting by designation.

_____

Affirmed in part, vacated and remanded in part by published opinion.
Chief Judge Wilkinson wrote the opinion, in which Judge Hamilton
and Judge Blake joined.

**COUNSEL**

**ARGUED:** Lisa Bondareff Kemler, MOFFITT, ZWERLING & KEMLER, P.C., Alexandria, Virginia, for Appellant. Vincent L. Gambale, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Alexandria, Virginia, for Appellee. **ON BRIEF:** John Kenneth Zwerling, MOFFITT, ZWERLING & KEMLER, P.C., Alexandria, Virginia, for Appellant. Helen F. Fahey, United States Attorney, William Graham Otis, Senior Litigation Counsel, UNITED STATES ATTORNEY'S OFFICE, Alexandria, Virginia, for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

Andrew Scott Morin was convicted of murder-for-hire, 18 U.S.C. § 1958(a), and sentenced to 21 months imprisonment. Morin contends that because the murder would have taken place outside the United States, it would have violated no federal or state law, a necessary element of § 1958(a). We disagree. Morin's intended murder would have violated at least one federal law and two Virginia laws.

The government, meanwhile, appeals the district court's substantial downward departure pursuant to the Sentencing Guidelines. The district court found three grounds for downward departure: (1) that the victim had engaged in wrongful conduct; (2) that the circumstances of Morin's offense fell outside the heartland of murder-for-hire cases; and (3) that Morin suffered from diminished capacity. We hold the district court erred in departing downward on the grounds of victim misconduct as well as on the circumstances of Morin's offense. We therefore affirm Morin's conviction but vacate and remand this case for resentencing.

I.

In 1984, when Morin was 10 years old, he began to take martial arts lessons from Dr. Armando Soto-Bararra ("Dr. Soto"). Eventually,

2

Dr. Soto became Morin's mentor and friend. Their friendship was such that Morin spent most of his free time working with Dr. Soto at his California home. In early 1994, Dr. Soto left his wife and daughter in California and travelled to the Philippines to manage a clinic. While Dr. Soto was away, Morin stayed with and was to look after Dr. Soto's family.

Morin claimed that during this stay, Dr. Soto's wife, Raghnild Perstolen, seduced him. Ms. Perstolen, however, has denied any sexual relationship with Morin. Whatever the case, Morin stated that he fell in love with Perstolen and that Perstolen later told him that she was being abused by Dr. Soto. Morin concluded that the only way to protect Perstolen was to hire a hit man to kill Dr. Soto.

Morin began his search for a hired killer by telephoning an acquaintance in New York, who referred Morin to Steve Hartman, a Virginia private investigator. Morin met with Hartman in Virginia and attempted to hire Hartman to kill Dr. Soto. Following this meeting, Hartman contacted the FBI. The FBI provided an undercover agent to pose as an assassin, and Hartman referred Morin to the agent. Morin subsequently telephoned the agent, discussed the plan to murder Dr. Soto, and mailed the agent a 13-page letter listing "Target Information/Pictures" and "Proposed Scenarios" for Dr. Soto's murder, including "one large caliber shot to the back of the head." Morin eventually flew to Virginia, met with the undercover agent, and provided him with $1,400 in cash and an airline ticket to the Philippines. The agent then arrested Morin.

Morin was charged with three counts of murder-for-hire, 18 U.S.C. § 1958(a), and one count of mailing a threatening communication, 18 U.S.C. § 876. At his bench trial, Morin offered an insanity defense. His psychiatrist testified that Morin was delusional and that the alleged affair between Morin and Perstolen had never occurred. The district court concluded that while Morin suffered from a "severe mental illness which included a delusional motivation for illegal conduct . . . [Morin] appreciat[ed] the nature and quality of wrongfulness of his acts." Morin was ultimately found guilty on all counts.

Under the Guidelines, Morin's base offense level was 32. Because Morin had accepted responsibility for his actions, he received a three-

level Guidelines reduction to 29. This resulted in a sentencing range of 87 to 108 months. The Presentence Report also noted three other factors that might warrant a downward departure in Morin's sentence: (1) Dr. Soto's alleged misconduct; (2) the unusual circumstances of this case; and (3) Morin's diminished capacity. The district court found that all three of these departures were appropriate, reduced Morin's offense level to 15 (with a recommended sentencing range of 18 to 24 months), and sentenced Morin to 21 months imprisonment. Both Morin and the government now appeal.

II.

The federal murder-for-hire statute requires an "intent that a murder be committed in <u>violation of the laws of any State or the United States</u>." 18 U.S.C. § 1958(a) (emphasis added).**1** Morin argues that this element has not been satisfied because the murder of Dr. Soto was to occur in the Philippines, outside the jurisdiction of the United States. Even so, however, Morin's intended murder would have violated both federal and Virginia law.

First, the murder of "a national of the United States, while such national is outside the United States" is a federal offense punishable "by death or imprisonment for any term of years or for life." 18 U.S.C. § 2332(a). Morin seeks to escape this offense by alleging that Dr. Soto was not a national of the United States, but rather, a Mexican citizen. Citizenship, however, is not the sine qua non of "nationality." A "national of the United States" may also be "a person who, though

_____

**1** 18 U.S.C. § 1958(a) states:

> Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility in interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay anything of pecuniary value or who conspires to do so, shall be . . . imprisoned for not more than ten years . . . and if personal injury results, shall be . . . imprisoned for not more than twenty years . . . and if death results, shall be punished by death or life imprisonment . . . .

4

not a citizen of the United States, owes permanent allegiance to the United States." 8 U.S.C. § 1101(a)(22). The district court found that because Dr. Soto was a permanent resident alien of the United States who had applied for United States citizenship, he was indeed "a national of the United States." We agree--an application for citizenship is the most compelling evidence of permanent allegiance to the United States short of citizenship itself. Accordingly, had Morin succeeded in killing Dr. Soto, the murder would have violated § 2332(a).**2**

Second, Morin's intended killing would also have violated Virginia law. The Virginia Code includes within its definition of "Capital Murder" the "willful, deliberate, and premeditated killing of any person by another for hire." Va. Code § 18.2-31(2). This is exactly what Morin intended to accomplish. It is without consequence that Morin intended for the killing to take place in the Philippines, because the hiring of the killer took place in Virginia and this is sufficient to violate the Virginia statute. See, e.g., Johnson v. Commonwealth, 220 Va. 146, 255 S.E.2d 525, 527 (1979) (Person who "conceived and instigated a murder for hire, and who procured" the killer violates the Virginia capital murder statute).

In fact, the government need not demonstrate that the murder of Dr. Soto would have violated the Virginia capital murder law. Section 1958(a) requires only that there be a "violation of the laws of any State or the United States." An intended murder may well violate laws other than those specifically prohibiting homicide. Here, Virginia has a separate crime of conspiracy to commit capital murder. Va. Code

_____

**2** We recognize that 18 U.S.C. § 2332(a) is part of an anti-terrorism statute and that it is uncertain whether Morin would have been prosecuted under § 2332(a). See 18 U.S.C. § 2332(d). Questions of ultimate prosecution and jurisdiction, however, simply exceed the plain meaning of § 1958. The "violation" element of murder-for-hire is a low hurdle, nothing more than an abstract comparison of a crime's elements with what the defendant intended to accomplish. Any further inquiry would lead courts down the path of speculation and distract both courts and juries from the central issues at stake in a § 1958 prosecution: 1) "travel or cause another to travel in interstate commerce, 2) with the intent that a murder be committed, [and 3)] consideration for the receipt of or promise to pay anything of pecuniary value." United States v. Ritter, 989 F.2d 318, 321 (9th Cir. 1993).

5

§ 18.2-22. Even if Morin could not have been charged by Virginia with a murder that took place in the Philippines, both Morin and his assassin, because they conspired to kill Dr. Soto in Virginia, would have committed the Virginia crime of conspiracy to commit capital murder. See Stevens v. Commonwealth, 14 Va.App. 238, 415 S.E.2d 881, 883 (1992) ("[t]he crime is `committed when the agreement to commit the offense is complete' and no overt act in furtherance of the underlying crime is necessary") (quoting Johnson v. Commonwealth, 8 Va.App. 34, 377 S.E.2d 636, 638 (1989)).**3**

As Morin's intended murder of Dr. Soto would have violated at least one federal and two Virginia laws, Morin's conviction satisfied the requisite elements of § 1958.

III.

We next turn to Morin's sentence. After the three-level reduction for acceptance of responsibility, Morin's Guidelines range fell between 87 and 108 months imprisonment. The district court, however, substantially departed from this recommended sentence because of: (1) Dr. Soto's alleged misconduct (USSG § 5K2.10); (2) the unusual circumstances of this case (USSG § 5K2.0); and (3) Morin's supposed diminished capacity (USSG § 5K2.13). Morin was ultimately sentenced to 21 months in prison, a punishment well below the usual range for murder-for-hire.

A.

The district court found that Morin's "viewing Soto as posing a serious physical threat to Ms. Perstolen is a significant circumstance

_____

**3** As a matter of Virginia law, Morin could not have been convicted for conspiracy to commit murder where the conspiracy was with an FBI agent. See Fortune v. Commonwealth of Virginia , 406 S.E.2d 47 (Va. App. 1991). The relevant question, however, under the federal murder-for-hire statute is whether Morin had an "intent that a murder be committed in violation of the laws of any State or the United States." 18 U.S.C. § 1958(a) (emphasis added). Although Morin ended up interacting with an FBI agent here, he intended to conspire with a hit man to commit murder, and under the plain terms of the federal statute, this is sufficient.

6

the Court must consider [because Soto's] <u>perceived</u> conduct played a part in this case" (emphasis added). The Sentencing Guidelines, however, explain that the victim misconduct departure is appropriate only "[i]f the victim's <u>wrongful</u> conduct contributed significantly to provoking the offense." USSG § 5K2.10 (emphasis added). The plain meaning of this provision contemplates that the victim must actually have done something wrong. <u>See United States v. Desormeaux</u>, 952 F.2d 182, 186 (8th Cir. 1991) (victim's conduct must be more than provocative, it must also be wrongful). Here, the only evidence that Dr. Soto did anything wrong was Morin's recollection of a statement by Ms. Perstolen--yet all of Morin's recollections are suspect given his psychiatrist's testimony of delusions and Perstolen's denial of the alleged affair. As it appears that Dr. Soto's behavior was imagined rather than real, it cannot be said that he did anything wrong. The victim misconduct departure does not apply in such cases.

Moreover, even if Dr. Soto had abused Ms. Perstolen,"[a] concern for the proportionality of the defendant's response is manifested by the terms of § 5K2.10." <u>United States v. Shortt</u>, 919 F.2d 1325, 1328 (8th Cir. 1990) (recognizing the wrongfulness of adultery but finding defendant's plot to blow up the adulterers to be a disproportionate response). This is evidenced by the factors that§ 5K2.10 instructs the court to consider: "any efforts by the defendant to prevent confrontation"; "the danger reasonably perceived by the defendant"; and "the danger actually presented to the defendant by the victim." Here, Morin was in no personal danger from Dr. Soto. He did not attempt to prevent a confrontation with his intended victim. He did not even attempt to insulate Ms. Perstolen from the perceived danger (for example, he could have contacted law enforcement officials about Dr. Soto's alleged behavior). Instead, Morin immediately set out to kill Dr. Soto. The victim misconduct guideline was not intended to benefit a defendant who sets out to murder someone whose conduct fails to meet with his approval. <u>See Shortt</u>, 919 F.2d at 1328. The district court erred in using it as a basis for a downward departure.

B.

Next, we address the district court's departure on the ground that Morin's offense fell outside the heartland of murder-for-hire. Because Morin was convicted of multiple offenses, he should have been sen-

tenced based on "the most serious of the counts comprising the Group." USSG § 3D1.3. Instead of sentencing Morin for murder-for-hire, his most serious offense, USSG § 2E1.4, the district court contravened the Guidelines by "using the guideline for threatening communications," a less serious offense, USSG § 2A6.1.

The district court justified its decision by concluding that the "motive for the hit, the extremely convoluted way in which the murder was to be committed, the naive way defendant interacted with the hit man and the fact that the hit man was an FBI agent" placed Morin's case outside the heartland of murder-for-hire. For many reasons, this rationale is not persuasive. While Morin claims an altruistic motivation for his murder-for-hire plot, it appears just as likely that Morin's motive, even if delusional, was simply the elimination of a perceived competitor for Ms. Perstolen's affections. In this regard, Morin's story is hardly outside the heartland of murder-for-hire; instead, it is another tale of romantic rivalry fueling a murder plot.

Moreover, it is not at all clear that Morin's supposed naivete would have prevented him from finding a willing assassin. He knew how to locate Dr. Soto, had photographs of Dr. Soto, and had financial resources sufficient to travel back and forth between California and Virginia, to purchase an airline ticket to the Philippines, and to provide the undercover agent with that ticket and $1400 in cash. Whether or not Morin had been able to locate a real hired killer willing to accept his offer at the time the plot was foiled is without moment. Murder-for-hire plots will often be thwarted at various stages between their fulfillment of the elements of 18 U.S.C. § 1958 and the actual point at which murder is to be committed. The statute takes this into account by distinguishing between plots that result in no injury, plots that result in injury, and plots that result in actual death. See 18 U.S.C. § 1958. Further, the Guidelines Commentary states: "This guideline and the statute to which it applies do not require that a murder actually have been committed." USSG § 2E1.4, comment. (backg'd.). Had the Sentencing Commission intended for foiled plots to fall outside the heartland of murder-for-hire cases, it would have said so.

The district court's other reasons for declaring this case outside the heartland are no more persuasive. Morin's plot is typical of murder-for-hire cases; he did after all suggest "one large caliber shot to the

8

back of the head." And the fact that it was an undercover agent who detected the offense is simply irrelevant to whether a particular defendant falls within the heartland of murder-for-hire. See United States v. Costales, 5 F.3d 480, 486-88 (11th Cir. 1993) (downward departure for minimal participation in offense not justified by fact that other participants were undercover officers). In short, Morin tendered a supposed hit man the sum of $1400 and plane tickets to the Philippines as part of a scheme to kill Dr. Soto. Morin's murder-for-hire plot was within the murder-for-hire heartland.

C.

We turn finally to the diminished capacity ground for the downward departure. Its validity hinges on the district court's factual determination that Morin's murder-for-hire plot was "non-violent." See USSG § 5K2.13 ("[i]f the defendant committed a non-violent offense while suffering from significantly reduced mental capacity . . . a lower sentence may be warranted"); United States v. Weddle, 30 F.3d 532 (4th Cir. 1994) (unlike USSG § 4B1.2, the specific facts of the offense determine whether it is non-violent under§ 5K2.13). Because we are uncertain regarding the extent to which this factual finding may have been influenced by the district court's erroneous belief that Morin's behavior fell outside the heartland of murder-for-hire cases, we must remand this case for resentencing. Resentencing would be required in any event because two of the district court's justifications for departure are in error and the court did not specify the weight it gave to those factors in determining the extent of any departure.

IV.

For the forgoing reasons, we affirm Morin's conviction but we vacate and remand his case for resentencing.

AFFIRMED IN PART, VACATED AND REMANDED IN PART

9