**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

No. 96-4454

ANDREW SCOTT MORIN, a/k/a Scott
Morris,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(CR-94-375)

Argued: December 5, 1996

Decided: September 11, 1997

Before WILKINSON, Chief Judge, and ERVIN and HAMILTON,
Circuit Judges.

_____

Vacated and remanded by published opinion. Judge Ervin wrote the
opinion, in which Chief Judge Wilkinson and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Vincent Gambale, Assistant United States Attorney,
OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Vir-
ginia, for Appellant. Lisa Bondareff Kemler, ZWERLING & KEM-
LER, P.C., Alexandria, Virginia, for Appellee. **ON BRIEF:** Helen F.
Fahey, United States Attorney, William G. Otis, Senior Litigation

Counsel, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellant. John Kenneth Zwerling, ZWERLING & KEMLER, P.C., Alexandria, Virginia, for Appellee.

_____

## OPINION

ERVIN, Circuit Judge:

Andrew Scott Morin was convicted of attempting to arrange a murder-for-hire and for sending a threatening communication through the mail. The government appealed Morin's sentence, and in United States v. Morin, 80 F.3d 124 (4th Cir. 1996), we vacated the sentence and remanded the case for resentencing. Morin was resentenced and the government again appeals his sentence. We vacate and remand the case for a second time with instructions that the trial court not depart from the United States Sentencing Guidelines (U.S.S.G.).

Morin was indicted on November 1, 1994, in a four-count indictment. Counts one through three charged Morin with violations of the federal murder-for-hire statute, 18 U.S.C. § 1958(a), and count four charged him with a violation of 18 U.S.C. § 876, using the mail to send a threat to kill another. At a bench trial which began March 13, 1995, Morin defended on the basis of insanity. Morin was found guilty of all counts in the indictment.

At the original sentencing hearing, the court noted that the base offense level for murder-for-hire was 32; however, the court departed downward to level 18 and imposed a sentence of 21 months in prison, followed by three years of supervised release. The court justified its downward departure on three bases.

Morin appealed his conviction on the murder-for-hire counts and the government cross-appealed from the court's decision to depart downward. We subsequently affirmed Morin's murder-for-hire convictions but vacated his sentence and remanded the case for resentencing since two of the district court's justifications for departure were found to be in error.

2

A resentencing hearing was held on May 16, 1996, at which time the district court imposed a sentence of 24 months imprisonment, to be followed by three years of supervised release. The district court again calculated the base offense level to be 32 and reduced the sentence by three levels for acceptance of responsibility to an adjusted level of 29. The court then departed downward 12 levels to 17 based upon Morin's diminished capacity. The government appeals the district court's sentencing departure. We, once again, vacate Morin's sentence and remand this case for resentencing.

I.

In early 1994, Dr. Armondo Soto-Barbarra (Soto), who had known Morin for a number of years and was fifteen years his senior, invited Morin, age 20, to move into his apartment in California to look after his wife, Ms. Raghnild Perstolen, while Soto went to the Philippines to manage a clinic. Morin claimed that Perstolen seduced him and that he fell in love with her. She denies this. Psychiatrists delivered conflicting testimony as to whether an affair likely took place or was just a product of Morin's delusional disorder. Morin also claimed that Perstolen led him to believe that Soto had abused her. While Soto remained in the Philippines, Morin decided to hire a "hit man" to kill Soto. In furtherance of that plan, Morin contacted Richard Marchinko in New York. Marchinko was the author of a book about counter-terrorist activities in Vietnam. Marchinko referred Morin to Steve Hartman, a private investigator in Virginia whose company specialized in, among other things, surgical shooting. Morin traveled to Virginia to meet Hartman and tried to hire him to kill Soto.

Hartman contacted the FBI, who arranged to put Morin in touch with an undercover agent posing as a hit man. Morin telephoned the agent, discussed the murder plan, and set up a meeting at which Morin would pay for the "hit" and provide the killer with a ticket to the Philippines. Before the meeting, Morin sent the "hit man" a 13-page letter listing "Target Information/Pictures" and "Proposed Scenarios" for the murder, including a suggestion for "one large caliber shot to the back of the head." In late June 1994, Morin flew to Virginia and gave the "hit man" $1400 cash and a round-trip ticket to the Philippines. Morin was then arrested.

3

Morin admitted these facts at trial. Morin's insanity defense rested largely on the testimony of a paid psychiatrist who stated that Morin was mentally ill. This doctor theorized that Morin's affair with Perstolen did not occur and that therefore Morin was delusional about her and the perceived threat to her safety. The government's psychiatrist concluded that Morin had a "narcissistic personality disorder" but was not psychotic. At Morin's original sentencing hearing, the district court concluded that Morin "suffer[s] from a severe mental illness which include[s] a delusional motivation for illegal conduct, but that . . . Morin appreciate[d] the nature and quality of wrongfulness of his acts."

II.

The PSR (Presentence Investigation Report) set Morin's base offense level at 32, U.S.S.G. § 2E1.4, and gave him a three-level reduction for acceptance of responsibility. This resulted in a guidelines range of 87 to 108 months for Morin's Criminal History Category I. The PSR also noted a number of "factors that may warrant departure," including 1) victim misconduct, U.S.S.G. § 5K2.10 (based on Morin's claim that he thought Perstolen needed protection from Soto), 2) the crime being outside "heartland" murder-for-hire cases, U.S.S.G. § 5K2.0, and 3) diminished mental capacity, U.S.S.G. § 5K2.13. In its original sentencing decision, the district court agreed that Morin's base level for murder-for-hire was 32, but it departed to level 18 on these three grounds.

On the "outside heartland" departure, the lower court initially concluded that Morin's crime was "more akin to sending a threatening communication" because of "the convoluted way in which the murder was to be committed, . . . the naive way the defendant interacted with the hit man, . . . [and the fact that] the chances of a successful `hit' in the real world were minimal." With respect to the diminished capacity rationale, the court noted at Morin's first sentencing hearing that "the chances of a real murder being carried out were most unlikely . . . because it would be ludicrous . . . to arrange for a hit to occur in the Philippines, to pay $1400 cash down payment to a stranger to commit the murder, to give the `hit man' a letter as collateral and to expect to pay the balance over time." Section 5K2.13 of the Sentencing Guidelines provides the following:

4

> Diminished Capacity (Policy Statement)
> If the defendant committed a non-violent offense while suf-
> fering from significantly reduced mental capacity . . . a
> lower sentence may be warranted to reflect the extent to
> which reduced mental capacity contributed to the offense,
> provided the defendant's criminal history does not indicate
> a need for incarceration to protect the public.

The district court attempted to articulate why Morin's conduct was a "non-violent offense" under § 5K2.13:

> If Hartman . . . had been a real hit man, what would have
> happened here is I have no doubt Mr. Morin would have
> come East and paid his money and never seen the money
> again, and that would have been it, because this whole sce-
> nario was so strange . . . the chances of it being carried out
> were very, very thin. So I really don't think we have the
> kind of violent offense that would be of concern normally
> for this type of crime.

In the government's original appeal from the district court's down-ward departure, it argued that all three departure grounds were errone-ous and that, even if a downward departure were justified, the extent of the departure was too great. In vacating Morin's sentence, we held that the district court erred in using the victim misconduct guideline, U.S.S.G. § 5K2.10, and the outside-the-heartland guideline, U.S.S.G. § 5K2.0, as justifications for downward departure. With respect to the departure under § 5K2.0, we stated that Morin's plot to have Soto murdered "is typical of murder-for-hire cases," and, therefore, the case was not outside the heartland. Morin, 80 F.3d at 129. "[I]t appears just as likely that Morin's motive, even if delusional, was simply the elimination of a perceived competitor for Ms. Perstolen's affections . . . [and his behavior] is another tale of romantic rivalry fueling a murder plot." Id.

We did not find, however, that the trial court had erred in departing on the basis of diminished capacity, U.S.S.G. § 5K2.13. Noting that the "validity" of such a departure "hinges on the district court's fac-tual determination that Morin's murder-for-hire plot was `non-violent,'" we remanded the case for resentencing since it was "uncer-

5

tain regarding the extent to which [that] factual finding may have been influenced by the district court's erroneous belief that Morin's behavior fell outside the heartland murder-for-hire cases." Id. We went on to state that resentencing was "required in any event" because there was no way for us to discern how much weight the district court gave to the two erroneous grounds it relied on in determining the extent of the departure. Id.

In resentencing Morin, the district court departed from the applicable guideline range by 12 levels based upon diminished capacity pursuant to § 5K2.13. As such, the district court increased Morin's original sentence by only three months, from 21 months to 24 months in prison, stating that "the essential basis for the departure" it originally granted was Morin's diminished capacity and that it had only awarded a one-level reduction for each of the erroneous grounds upon which it had previously relied.

In concluding that a departure under the diminished capacity guideline was warranted, the district court specifically found the acts resulting in Morin's conviction constituted a "non-violent offense" under § 5K2.13. The court found that "the extremely serious delusional problems that he had . . . were both the motivation for the crime and they drove the way in which he went about committing the crime." The court below finally concluded that "[t]he potential for violence in this particular case under these circumstances just wasn't there."

III.

A.

We have set out a fact-based standard for determining whether crimes are non-violent under the diminished capacity provision of the guidelines, U.S.S.G. § 5K2.13. See United States v. Weddle, 30 F.3d 532, 537 (4th Cir. 1994). While courts of appeal must "give due deference to the district court's application of the guidelines to the facts," we recognize that the findings of fact of the district court shall be accepted unless they are clearly erroneous. Koon v. United States, ___ U.S. ___, 116 S.Ct. 2035, 2046 (1996) (quoting 18 U.S.C. § 3742(e)). Although a definition of crimes of violence is found elsewhere in the guidelines, we have held that the definition of a "crime of violence"

in § 4B1.2 of the sentencing guidelines (regarding career offenders) is not applicable to § 5K2.13 and its reference to a "non-violent offense."[1] See Weddle, 30 F.3d at 540. See also United States v. Chatman, 986 F.2d 1446, 1451-52 (D.C. Cir. 1993). Rather, when applying § 5K2.13 the sentencing court should make a fact-specific investigation of the offense to determine whether it was non-violent.[2] Weddle, 30 F.3d at 540.

In our instructions to the court below on our previous remand, we stated that the validity of the diminished capacity ground for downward departure "hinges on the district court's factual determination that Morin's murder-for-hire plot was `non-violent.'" United States v. Morin, 80 F.3d 124, 129 (4th Cir. 1996) (emphasis added). In making this determination, the district court's finding that Morin suffered diminished capacity is simply one factor to be considered by the court in analyzing whether the behavior was non-violent.

B.

The government's central challenge to the resentencing is that the district court erred by considering Morin's "reduced mental capacity" in reaching its conclusion that his actions constituted a "non-violent offense" under § 5K2.13. The government argues that "a `non-violent' crime and `reduced mental capacity contribut[ing] to the commission of the offense' are separate and distinct requirements for departure." Br. for Appellant at 12 (quoting U.S.S.G. § 5K2.13). We hold, rather, that the court below did not err by considering Morin's reduced men-

_____

[1] Under § 4B1.2, Morin's behavior would constitute a "crime of violence" because that section includes among such crimes the "threatened use of physical force against the person of another." U.S.S.G. § 4B1.2(1).
[2] By contrast, at least five circuits have applied the definition of "crime of violence" from § 4B1.2 of the guidelines and concluded that, if an offense fits that definition, it cannot be non-violent pursuant to § 5K2.13. United States v. Cantu, 12 F.3d 1506, 1513 (9th Cir. 1993); United States v. Poff, 926 F.2d 588, 591 (7th Cir.) (en banc), cert. denied, 502 U.S. 827 (1991); United States v. Russell, 917 F.2d 512, 517 (11th Cir. 1990), cert. denied, 499 U.S. 953 (1991); United States v. Rosen, 896 F.2d 789, 791 (3d Cir. 1990); United States v. Maddalena , 893 F.2d 815, 819 (6th Cir. 1989), cert. denied, 502 U.S. 882 (1991).

7

tal capacity in its determination that his crime was non-violent. However, we also hold that Morin's reduced mental capacity <u>alone</u> was not sufficient to justify the court's conclusion that his murder-for-hire plot was non-violent.**3** The circumstances surrounding the plot, including Morin's mental illness, do not render it a non-violent offense.

The district court declared at Morin's resentencing hearing that "[t]he essential basis for this departure is that given that diminished mental capacity, this was not a crime of violence." Morin contends, and the district court agreed, that his diminished capacity and the danger posed by his behavior are inextricably linked. The court below reasoned that if Morin had not been driven by his "fantasy" and "Robin Hood-type motive," he presumably would not have been so naive in the way he went about hiring a hit man. According to the court, the unsophisticated manner in which Morin attempted to carry out his plot "was driven . . . by his delusional state."

In our initial opinion remanding this case, we discussed why Morin's plot brought the case within the heartland murder-for-hire cases. In that opinion, we suggested that Morin's behavior was violent <u>in spite of</u> his mental condition; however, we regretfully did not spell out this conclusion. In that initial decision, we noted that Morin took substantial steps in furtherance of the crime, and that the fact that his plot was thwarted had no bearing on the potential for injury. <u>Morin</u>, 80 F.3d at 128. Further, we stated that "it is not at all clear that Morin's supposed naivete would have prevented him from finding a willing assassin." <u>Id.</u>

Morin contends that certain facts, even when considered independently from his mental capacity, indicate that his plan may not have succeeded. Morin attempted to hire a legitimate security consultant to carry out a contract killing. Also, Morin simply gave the "hit man" $1400 and a plane ticket with no assurance that the man would not simply take the money and not do the job. Finally, Morin attached to

_____

**3** The government has not challenged the factual basis for the reduced mental capacity component of § 5K2.13 because medical evidence was presented concerning Morin's mental illness; thus, the finding of non-violence is the relevant issue for our review.

his resentencing memorandum a letter containing the opinions of two former Maryland state police officers that Morin's actions were unique among individuals planning contract murders and that the actions demonstrated a blatant failure by Morin to insulate himself from the proposed crime. The district court considered these facts in its determination that "the potential for violence in this particular case, under these circumstances just wasn't there."

In our original opinion in this case, we noted facts that tend to show that Morin's murder-for-hire scheme was indeed dangerous and could have succeeded had it not been thwarted by the FBI:

> [Morin] knew how to locate Dr. Soto, had photographs of Dr. Soto, and had financial resources sufficient to travel back and forth between California and Virginia, to purchase an airline ticket to the Philippines, and to provide the undercover agent with the ticket and $1,400 cash.
>
> [. . .]
>
> Morin's plot is typical of murder-for-hire cases; he did after all suggest "one large caliber shot to the head."

Morin, 80 F.3d at 128-29.

In Weddle we found no error in the district court's determination of non-violence under § 5K2.13; the facts of the instant case, however, may be distinguished from those in Weddle .4 In that case, the defendant (Weddle) continued to threaten to kill the intended victim (Angleberger) even after Weddle was charged with assault for attempting to run Angleberger off the road and hit him with a "slapjack." Weddle, 30 F.3d at 540. The final threat, and the act at issue on appeal, took the form of bullets sent through the mail and inscribed with Angleberger's name. Id. Even though the involvement of law enforcement apparently did not deter Weddle from making threats, the fact that Angleberger had notice of proposed threats to his life

_____

**4** In Weddle, we affirmed a probationary sentence when the sentencing guidelines called for a pre-reduction sentence of incarceration.

9

may have placed him in less danger than Soto because he was able to seek the protection of law enforcement. Also, the offense before us in Weddle involved threatening communications whereas the instant case involves acts taken in furtherance of a carefully orchestrated murder.

We distinguish the instant case from Weddle and determine that the steps taken towards completion of Morin's plot preclude it from being labeled a non-violent offense. A reduction in a defendant's sentence is not proper under § 5K2.13 unless the facts support the proposition that the offense was non-violent. In the instant case, applying the clearly erroneous standard to the district court's factual findings, that court committed clear error in finding that Morin's plot was non-violent.

IV.

Since a defendant's offense must be found to be non-violent in order to invoke § 5K2.13, and since the facts of the instant case do not support the district court's determination of non-violence, that court erred by reducing Morin's sentence pursuant to § 5K2.13. Accordingly, Morin's sentence is vacated and this case is remanded for resentencing within the range prescribed by the sentencing guidelines.

VACATED AND REMANDED

10