**UNITED STATES of America,**

v.

**Nephtali DEJESUS, Defendant.**

**No. S1 98 CR 396 SAS.**

United States District Court,
S.D. New York.

July 26, 1999.

Kevin Reed, Assistant United States Attorney, New York City, for Government.

Joel S. Cohen, New York City, for Defendant.

### *OPINION*

SCHEINDLIN, District Judge.

### I. *Background*

Defendant Nephtali DeJesus was found guilty, after a jury trial, of conspiring to commit assault in aid of racketeering and attempting to commit assault with a dangerous weapon, both counts in violation of 18 U.S.C. § 1959(a)(6). At the time of the incident, defendant was a member of the Latin Kings and, in fact, held the position of "warlord," the third highest ranking title of that organization.

The incident which gave rise to the convictions occurred on October 23, 1997. On

that day, Carmen Selgado, defendant's girlfriend and common law wife, was beaten by her brother Jose Sierra (a/k/a "Little"). After a verbal altercation on the street, Sierra began to beat his sister who, at the time, was pregnant with DeJesus' unborn child. She testified as follows:

> A: So when he hit me the first time I told him, Little, don't hit me, I don't want to disrespect you, don't hit me. And he hit me again. So the second time he hit me I hit him back.
>
> So we started fighting. And then he punched me in my stomach. I was down like that and he upper cut me and hit me in my nose.
>
> Q: Why were you down?
>
> A: Because I didn't want him to hit me in my stomach.
>
> Q: You were showing -
>
> A: Yes, I was five months pregnant.
>
> Q: Then what happened?
>
> A: So we was fighting. He threw me up against the car, he had my neck up against the car.
>
> He said I will kill you, bitch. I'll kill you. That's when this guy Ketchup and Ariel came running towards us and they separated the fight.
>
> They say, what are you doing hitting the [sic] sister, she is pregnant.

Trial Transcript ("Tr.") at 442–43.

DeJesus, who was himself threatened by Little,[1] was enraged by the beating. *See* Presentence Report ("PSR"), ¶ 18. In fact, Salgado testified that:

> When I got to Darlene's house, I knocked on the door. [DeJesus] answered the door and he was, like, shocked because he seen my face was all full of blood. And my shirt was all full of blood.
>
> So he get real upset. He started crying. What happened? Your brother just

came over her threatening me. Why he hit you? Whatever, whatever.

And I told him what happened.

Tr. at 444.

Much to his credit, defendant's first response was to call the police. Tr. at 444. Salgado, however, refused to have her brother arrested because he already had "a case for domestic violence." *Id.* Without her cooperation, DeJesus felt that police assistance would be useless. DeJesus' next response was to gather a group of Latin King members in his apartment and plan an attack on Little. PSR, ¶ 20. Twelve members took part in the meeting. *Id.*, ¶ 24. One of the members brought a gun to the meeting, another a knife and another a chain. *Id.*, ¶ 26. After saying their tradition mortal warrior prayer, *id.* at ¶ 22, the group set out to the residence of Little in small clusters. Before committing any violence, they were apprehended by the police en route. *Id.*, ¶ 23.

## II. *The Offense Level*

DeJesus was convicted of conspiracy to commit assault in aid of racketeering and attempt to commit an assault in aid of racketeering. These counts are grouped pursuant to § 3D1.2.[2] The guideline for these grouped offenses is found at § 2E1.3, which requires the Court to apply the greater of 12 or the offense level applicable to the underlying crime, which here is aggravated assault. The guideline for aggravated assault is found at § 2A2.2(a), which sets a base offense level of 15.

■ The Probation Department recommends an upward adjustment for DeJesus' role as a manager or supervisor is warranted here. I decline to impose such an adjustment. The evidence of record does not establish that DeJesus either managed or supervised other Latin King members.

---

1. At trial, Sierra testified that "I knocked on the door, and I said a whole bunch of stuff out of anger. I said I was going to kill him [DeJesus]. I said I was going to beat him [DeJesus] up. So on and so forth." Tr. at 404–05.

2. Unless otherwise noted, all "section" references are to the United States Sentencing Guidelines.

Although he did have the power to call them to a meeting, it is my understanding of the structure of that organization that any member is required to attend a meeting when any other member seeks help. There is also no evidence that the defendant exercised management responsibility over the activities of this criminal organization. While I understand that the presentence report uses the term "warlord," the evidence presented at trial does not support a finding that an upward role adjustment is required. I therefore decline to impose such an adjustment.

### III. *Departures*

■ "Although the Sentencing Guidelines were intended to create consistency in sentencing for 'offenders with similar histories, convicted of similar crimes, committed under similar circumstances,' they were not meant to eliminate all of the district court's discretion." *United States v. Adelman,* 168 F.3d 84, 86 (2d Cir.1999) (quoting *Koon v. United States,* 518 U.S. 81, 92, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996)). "[T]he Supreme Court explained that before a sentencing court departs downward, it must determine that aspects of the case are 'unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing.'" *United States v. Galante,* 111 F.3d 1029, 1033 (2d Cir.1997) (quoting *Koon,* 518 U.S. at 98, 116 S.Ct. 2035). "After such consideration, if a district court decides to depart from the Guidelines, in most cases its decision will 'be due substantial deference, for it embodies the traditional exercise of discretion by a sentencing court.'" *Adelman,* 168 F.3d at 86–87 (quoting *Koon,* 518 U.S. at 98, 116 S.Ct. 2035).

### A. *Downward Departure—Criminal History Category*

DeJesus' criminal history is described at paragraphs 43–58 of the presentence report. That report assigns 12 criminal history points to DeJesus, which places him in Criminal History Category V. Section 4A1.3 explicitly provides for a downward departure "where the court concludes that a defendant's criminal history category significantly overrepresents the seriousness of a defendant's criminal history or the likelihood that the defendant will commit further crimes." *See also United States v. Ashley,* 141 F.3d 63, 69 (2d Cir. 1998) (Guidelines authorize a departure where a defendant's criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that he will commit further crimes); *United States v. Rivers,* 50 F.3d 1126, 1131 (2d Cir.1995) (a sentencing judge should exercise discretion whenever she concludes that the criminal history calculation under-represents the seriousness of defendant's prior record). Here, a downward departure is warranted with respect to defendant's criminal history on both grounds.

At the age of 18, the defendant was convicted of the attempted sale of marijuana in the 4th degree, for which he was sentenced to 10 days in jail or a fine, resulting in 1 Criminal History point. A year later, at the age of 19, he was convicted of petit theft and was sentenced to 6 months probation resulting in 1 Criminal History point (now 2); In 1993, at age 21, defendant was convicted of criminal possession of a weapon in the 4th degree, for which he was sentenced to 2 months in jail and probation. Because he violated probation, he was resentenced to one year in jail. This results in 2 more criminal history points (now 4). That same year, he was convicted of the attempted criminal sale of a controlled substance, for which he was sentenced to a term of 1–3 years in jail resulting in an additional 3 criminal history points (now 7). Again in 1993, defendant was convicted of third degree assault, for which he received a conditional discharge resulting in one additional criminal history point (now 8). Finally, in 1995, he was convicted of dealing in stolen property, for

which he received a term of probation, community service and restitution. This results in an additional criminal history point (now 9).

The instant crime occurred in October, 1997. Defendant was on probation until January, 1998. Thus, at the time of the instant offense, defendant was on probation. An additional 2 points are added (to 11) pursuant to § 4A1.1(d). Finally, because the instant offense was committed less than 2 years after his release from custody (February 15, 1996), an additional criminal history point (to 12) is warranted pursuant to § 4A1.1(e). Twelve criminal history points places him in Criminal History Category V.

■ Criminal History Category IV includes those who have accumulated 7, 8 or 9 criminal history points. Category V starts with those who have accumulated 10 criminal history points. Category V is the highest category of criminal offender short of a career criminal. In reviewing this defendant's convictions, it appears that he does not belong in such a high category. Several of his sentences were probation terms or conditional discharges. Of the three jail sentences he received, only one was for longer than 60 days. On balance, I find that Criminal History Category IV, while still high, is a much more appropriate category reflecting the seriousness of this defendant's past criminal conduct.

The Government opposes this departure stating that the defendant has eight prior convictions.[3] Two of those eight convictions were for loitering and trespassing and were so minor they did not even count for guideline purposes. The remaining six convictions occurred over little more than a four-year period of time from October 1990 through January 1995. These convictions, collectively, resulted in no more than 2 years in jail. In addition, 3 criminal history points are the result of the cumulative impact of § 4A1.1(d) and 4A1.1(e)

which adds to the overstatement. For these reasons, I conclude that Criminal History Category V overstates defendant's criminal history.

Typically, a defendant who falls in category V has committed serious crimes requiring lengthy imprisonment. A high criminal history category demonstrates that there is little reason to believe that previous punishment has had any impact on the defendant and that he is unlikely to be rehabilitated. That concept accounts, in part, for the lengthening of guideline sentences as the criminal history category increases. Most of DeJesus' criminal conduct was committed before he was 21 years old. He is now a husband and first-time father, and this responsibility provides a strong incentive for rehabilitation. A lengthy sentence required by a higher criminal history category will lessen, not increase, the likelihood of rehabilitation. Thus, I conclude that because most of his earlier crimes were non-violent and because he has not served any significant terms of incarceration, his Criminal History Category is better represented by Criminal History Category IV.

### B. *Downward Departure—Provocation/Victim Conduct*

■ Section 5K2.10 states that "if the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense." In fact, the Supreme Court has held that victim provocation is "an example of an encouraged downward departure factor ..." *Koon*, 518 U.S. at 94, 116 S.Ct. 2035. Here, I have no doubt that the victim's wrongful conduct contributed significantly to the offense behavior. In addition, it was reasonable for the defendant to feel

---

**3.** The Government also points out that a court's discretion under § 4A1.3 is not unfettered and departures on this ground must be supported by specific reasons. *See United*

*States v. Butler*, 954 F.2d 114, 121 (2d Cir. 1992); *accord United States v. Tejeda*, 146 F.3d 84, 86–87 (2d Cir.1998); *United States v. Joyner*, 924 F.2d 454, 459 (2d Cir.1991).

seriously threatened by Sierra's threat to kill him.

The Guidelines direct the court to consider five circumstances in deciding "the extent" of a sentence reduction. These five factors need not be satisfied before a departure is given. Rather, once a court has decided that the departure is warranted, these factors should be considered in deciding how much of a departure to give.

I will now address each of the factors listed in the Guidelines:

(1) The size and strength of the victim versus that of the defendant. In fact, I agree with the defense that the relevant issue here is the size and strength of the victim versus that of his victim, namely defendant's girlfriend. That was clearly disproportionate. DeJesus had reason to believe that Sierra posed a real and terrible threat to his defenseless girlfriend and future child. In addition, the defendant and his victim were relatively similar in size and strength, which does not cut in either direction.

(2) The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation. This victim clearly had violent tendencies. He had expressed them many times before and would likely do so again. As noted earlier, defendant's first response was to call the police, until he was prevented from doing so by his wife who was also the victim's sister. This cuts in defendant's favor.

(3) The danger reasonably perceived by the defendant, including the victim's reputation for violence. After beating his pregnant sister, there was every reason to believe that Sierra posed a real threat to DeJesus, his girlfriend, and unborn child.

(4) The danger actually presented to the defendant by the victim. The same conclusion reached in (3).

(5) Any other relevant conduct by the victim: His decision to attack a defenseless pregnant woman demonstrates the depravity of his conduct and the risk of future attacks.

The Government argues against this departure and has cited cases disallowing the departure based on the disproportionality of the response. *See United States v. Morin,* 80 F.3d 124, 128 (4th Cir.1996) (" '[a] concern for the proportionality of the defendant's response is manifested by the terms of § 5K2.10' ") (quoting *United States v. Shortt,* 919 F.2d 1325, 1328 (8th Cir.1990)). These cases are, however, inapposite. In *Morin,* the defendant was found guilty of murder-for-hire. 80 F.3d at 126. The intended victim, Dr. Soto, was to be murdered for allegedly abusing his wife, Ms. Perstolen, whom the defendant had fallen in love with. *Id.* at 125. The court rejected a downward departure based on § 5K2.10 on the ground that defendant's response to the perceived abuse was disproportional.[4] The court stated:

> Here, Morin was in no personal danger from Dr. Soto. He did not attempt to prevent a confrontation with his intended victim. He did not even attempt to insulate Ms. Perstolen from the perceived abuse (for example, he could have contacted law enforcement officials about Dr. Soto's alleged behavior). Instead, Morin immediately set out to kill Dr. Soto. The victim misconduct guideline was not intended to benefit a defendant who sets out to murder someone whose conduct fails to meet with his approval.

*Id.* at 128 (citation omitted). Similarly, in *Shortt* the appellate court rejected a downward departure based on victim provocation. 919 F.2d at 1328. There, the defendant placed a bomb in the truck of a man who was having an affair with his wife. *Id.* at 1325. According to the court,

---

**4.** It is noteworthy that unlike here there was no proof that the victim's victim (Ms. Persto-

len) was actually abused.

"[t]hough certainly wrongful and provocative, adultery does not justify blowing up the adulterers, or building a bomb capable of doing so." *Id.* at 1328.[5] Unlike the present case, the victims in *Morin* and *Shortt* had not provoked the defendants whose calculated actions were completely disproportionate. There is also a temporal element in *Morin* and *Shortt* not present here. In *Morin*, the defendant had to search for his hired killer and was ultimately referred to an undercover FBI agent after meeting with a private investigator who declined the engagement. 80 F.3d at 126. In *Shortt*, the defendant was found guilty of making a pipe bomb, an act which indisputably takes some time. 919 F.2d at 1326.

Here, defendant's conduct was proportional to that of the victim. DeJesus reacted the same day to the provocation of suffering the beating of his common law wife who was carrying his unborn child and the threat directed at him. This was not a calculated planned response but rather was directly responsive to the immediate provocation. DeJesus believed that he and his family were in real danger. Without in any way condoning the response, the circumstances here warrant a downward departure.

█ What the defendant did was very wrong but not incomprehensible. He called his friends together with the express intention of punishing Sierra. This is wrong because no one can take the law into their own hands. However, the motivation for his crime can be understood and even appreciated. Sierra's conduct in beating and injuring his pregnant sister was vile and repugnant. Such action might cause anyone to lose their sense of right and wrong. Thus, the extreme provocation under which DeJesus acted is a mitigating factor not fully considered by the Sentencing Commission. *See* § 5K2.0. In addition, the victim's conduct contributed significantly in provoking the offense.

*See* § 5K2.10. A district court has the discretion to conclude that victim misconduct can take a particular offense outside the heartland of cases. *See Koon*, 518 U.S. at 105, 116 S.Ct. 2035 ("the District Court did not abuse its discretion in departing downward for King's misconduct in provoking the wrong"). I hereby exercise this discretion and decrease the offense level four points, from 15 to 11.

## IV. *The Sentence*

At offense level 11, Criminal History Category IV, defendant's final guideline range is 18 to 24 months in custody. I therefore impose a sentence of 18 months in jail to be followed by a one year period of supervised release. In addition, Mr. DeJesus is required to pay a mandatory assessment of $200, which payment is due at the end of the period of supervised release. No fine is imposed as defendant is unemployed and has little or no financial resources. Finally, the following special conditions of supervised release are required: (1) he should not associate with the Latin Kings; and (2) defendant shall participate in a program approved by U.S. Probation Office for substance abuse, which program may include testing to determine whether the offender has reverted to the use of drugs or alcohol. Defendant is to report to the nearest Probation Office within 72 hours of his release from custody.

This sentence was fashioned based on the circumstances surrounding the crime for which DeJesus was convicted. As the Probation Report demonstrates the planned violence here was in connection with defending a pregnant woman who had been beaten up by her brother. DeJesus was and is the father of that child. He asked Salgado, his girlfriend and the mother to be of his son, to call the police. She refused. It was in response to this that DeJesus acted. On the other hand, I as-

---

5.  Once again, unlike here there was no evidence that the victim had inflicted physical injury on either the defendant or his family.

sume that if the informant had not alerted the police, he and other Latin King members would have used violence, and people would have been hurt. Although no violence occurred on this occasion, the point is that the defendant was prepared to commit a violent and unlawful act. It is for this reason that he must be punished. Eighteen months is an appropriate sentence.